IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL WILDLIFE REFUGE ASSOCIATION, 1701 K Street NW, Suite 550, Washington, DC 20006,<br><br>NATIONAL PARKS CONSERVATION ASSOCIATION, 777 6th Street NW, Suite 700, Washington, DC 20001,<br><br>DEFENDERS OF WILDLIFE, 1130 17th Street NW, Washington, DC 20036, and<br><br>CENTER FOR BIOLOGICAL DIVERSITY, P.O. Box 710, Tucson, AZ 85702,<br><br>    Plaintiffs,<br><br>    v.<br><br>The UNITED STATES ARMY CORPS OF ENGINEERS, 441 G Street NW Washington, DC 20314-1000, and<br><br>MICHAEL CONNOR, in his official capacity as Assistant Secretary of the Army for Civil Works, 108 Army Pentagon, Washington, DC 20310-0108,<br><br>    Defendants. | Case No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. This case challenges the United States Army Corps of Engineers' (Corps) reinstatement of two Clean Water Act approved jurisdictional determinations (AJDs) held by Twin Pines Minerals, LLC (Twin Pines) that the Corps had rescinded a mere two months earlier.

2. Those AJDs, issued under the "Navigable Waters Protection Rule" (NWPR)— which the Corps has itself determined to be unlawful—removed Clean Water Act protections

1

from nearly 550 acres of wetlands that the Corps had previously determined to be jurisdictional "waters of the United States."

3.  The affected wetlands sit at the doorstep of the Okefenokee National Wildlife Refuge, one of the most celebrated natural resources in the world.

4.  If the reinstated AJDs (the Twin Pines NWPR AJDs) remain in place, Twin Pines intends to strip-mine heavy mineral sands from hundreds of acres of wetlands on the proposed mine site without any federal permit. Although these wetlands are outside the Refuge boundaries, they—and the ridge on which they sit—are critical to the hydrology and ecology of the Okefenokee Swamp.

5.  After initially issuing the Twin Pines NWPR AJDs in October 2020 and March 2021, the Corps determined as part of federal rulemaking that the NWPR was inconsistent with the Clean Water Act and the best available science. Two federal courts also vacated the NWPR and remanded the rule to the Corps and to EPA.

6.  The Corps subsequently issued internal guidance to all 38 Corps districts stating that landowners cannot rely on NWPR AJDs to support the discharge of dredged and fill material into currently jurisdictional wetlands like those at issue here.

7.  The Corps specifically rescinded the Twin Pines NWPR AJDs in June 2022, noting that Twin Pines could not rely on the AJDs to accurately delineate jurisdictional waters under the current regulatory regime and that the Twin Pines NWPR AJDs were not valid because the Corps had not consulted with the Muscogee (Creek) Nation, which has ancestral homelands in and around the project area.

8.  Just two months later, however, the Corps abruptly reinstated the Twin Pines NWPR AJDs without offering any reasoned explanation.

9. The Corps' decision to reinstate the Twin Pines NWPR AJDs without any reasoned explanation, despite the agency's written determinations that the NWPR was unlawful and that landowners may not rely on NWPR AJDs to discharge dredged and fill material into currently jurisdictional wetlands, is arbitrary and capricious.

10. By reinstating the Twin Pines NWPR AJDs, the Corps has stripped the proposed mine site of not only protections provided by a Clean Water Act permit, but also a host of other protections guaranteed by federal law, including those under the National Environmental Policy Act, the Endangered Species Act, the National Historic Preservation Act, and the Nation-to-Nation Tribal consultation process.

11. This Court should set aside the Corps' decision to reinstate the Twin Pines NWPR AJDs, thereby ensuring the proposed mine receives the level of federal agency, public, and Tribal review guaranteed by federal law.

## JURISDICTION AND VENUE

12. This action arises under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706, which waives Defendants' sovereign immunity.

13. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and may issue declaratory and other relief pursuant to 28 U.S.C. §§ 2201–02.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants reside in this district, three of the four Plaintiffs are headquartered in this district, and a substantial part of the events giving rise to these claims occurred in this district.

## PARTIES

**A.     Plaintiffs**

15.     Plaintiffs (collectively, the Conservation Groups) are non-profit conservation organizations committed to protecting the Okefenokee National Wildlife Refuge.

16.     Plaintiff National Wildlife Refuge Association (NWRA) is a national non-profit organization headquartered in Washington, D.C. NWRA's mission is to conserve America's wildlife heritage for future generations through strategic programs that protect, promote, and enhance the National Wildlife Refuge System and the landscapes beyond its boundaries.

17.     Plaintiff National Parks Conservation Association (NPCA) is a national non-profit organization headquartered in Washington, D.C. Representing more than 1.6 million members and supporters, NPCA works to protect and preserve the nation's most iconic and inspirational places for present and future generations.

18.     Plaintiff Defenders of Wildlife (Defenders) is a national non-profit organization headquartered in Washington, D.C. Defenders, along with its 354,000 members, is dedicated to the protection of all native animals and plants in their natural communities. As part of this mission, Defenders works to protect public and private lands and core natural areas that support native wildlife, including the Okefenokee National Wildlife Refuge.

19.     Plaintiff Center for Biological Diversity (the Center) is a national non-profit organization headquartered in Tucson, Arizona, with offices in eight states, the District of Columbia, and Mexico. With more than 89,000 members, the Center is dedicated to the protection of endangered species and wild places, including the Okefenokee National Wildlife Refuge, with a focus on protecting the lands, waters, and climate that species need to survive.

20. The Conservation Groups have spent substantial time and resources to protect the Okefenokee National Wildlife Refuge and the wetlands it depends on. Each organization is a member of the Okefenokee Protection Alliance, a coalition of more than 40 environmental organizations formed in response to the Twin Pines mining proposal. As part of the Coalition, each organization submitted comments to the Corps in 2019 and 2020 voicing its opposition to the proposed mine. The Conservation Groups' employees have traveled to Washington, D.C., and Atlanta to meet and discuss the proposed mine with officials from the U.S. Fish and Wildlife Service, the Corps, and EPA, as well as members of Congress. The Conservation Groups have also actively engaged in outreach to the media, their members, and local communities to raise awareness about the environmental costs of mining near the Okefenokee.

21. In addition, the Conservation Groups have members who routinely visit the Okefenokee National Wildlife Refuge and have recreational, aesthetic, educational, economic, scientific, and professional interests in the wetlands affected by the mine and in the ecological integrity of the Okefenokee National Wildlife Refuge.

22. If the Corps' unlawful actions are allowed to stand, the Conservation Groups and their members will be irreparably injured. These harms would be redressed by an order from this Court.

**B.    Defendants**

23. Defendant U.S. Army Corps of Engineers is an agency within the U.S. Department of Defense. The Corps is responsible for the issuance of permits and AJDs under Section 404 of the Clean Water Act. Along with EPA, the Corps is also responsible for conducting federal rulemaking to define the term "waters of the United States" under the Clean Water Act. The Corps' headquarters is in Washington, D.C.

24. Defendant Michael Connor is the Assistant Secretary of the Army for Civil Works, the office responsible for overseeing the Corps. Assistant Secretary Connor's office is in Washington, D.C. Assistant Secretary Connor is sued in his official capacity.

## FACTUAL BACKGROUND

**A.     The Okefenokee Swamp and National Wildlife Refuge**

25. The Okefenokee Swamp is one of the largest intact freshwater ecosystems in North America. Unlike many other globally significant wetlands, the Okefenokee Swamp is the source of rivers, rather than their recipient—allowing it to escape many upstream disturbances that threaten other globally important wetlands, like the Everglades and the Great Dismal Swamp. As a result, the Okefenokee is among the most wild, pristine, and ecologically intact places in America, with more than one thousand different species of animals and plants calling it home.

26. For nearly a century, the United States has celebrated and protected the Okefenokee Swamp. In 1937, President Franklin Roosevelt designated the Okefenokee Swamp as a National Wildlife Refuge, and it remains the largest refuge in the eastern United States. It is also a National Wilderness Area and a National Natural Landmark, a designation reserved for "the best examples of biological and geological features" in the country.

27. On an international scale, the Okefenokee National Wildlife Refuge is designated as a "Wetland of International Importance" under the United Nations Ramsar Convention and is also a candidate for designation as a UNESCO World Heritage Site. As the U.S. Fish and Wildlife Service has put it, "The Okefenokee is like no other place on earth."



The Okefenokee National Wildlife Refuge [Michael Lusk, U.S. Fish & Wildlife Service]

28. From a biodiversity perspective, the Okefenokee is a critical link in important wildlife corridors that connect park and conservation lands around the Southeast. For example, the proposed Florida Wildlife Corridor stretches from Everglades National Park to the Okefenokee National Wildlife Refuge to protect habitat for threatened and endangered species across the region, including the Red-Cockaded Woodpecker, Whooping Crane, Wood Stork, Florida Panther, and Eastern Indigo Snake. The Okefenokee is also a central connecting feature within another priority wildlife corridor linking three National Park Service units: the Ocmulgee Mounds National Historic Park, the Cumberland Island National Seashore, and the Fort Frederica National Monument.

29. In addition to its environmental value, the Okefenokee National Wildlife Refuge is economically important to local residents. With approximately 600,000 annual visits, the Refuge's visitation numbers are on par with those of many iconic national parks like Big Bend, Redwood, and Denali. These visits are critically important to Georgia and nearby communities, supporting over 750 jobs, $17.2 million in annual employment income, $5.4 million in annual tax revenue, and $64.7 million in annual economic output per year, according to the U.S. Fish and Wildlife Service.

30. The cultural and historic resources associated with the Okefenokee Swamp are equally important, with Native American roots reaching back thousands of years. The Muscogee (Creek) Nation, for example, is currently working with the U.S. Fish and Wildlife Service to designate its ancestral homelands within the Okefenokee Swamp—once described as "the most blissful spot on earth" by the Nation—as a Traditional Cultural Property. Indeed, the word "Okefenokee" itself, a Muscogee word meaning "trembling earth," is a testament to the region's Native American history.

31. The Okefenokee is also important from a climate perspective, holding the largest remaining undisturbed peat deposit on the North American Coastal Plain. With peat layers up to 15 feet deep in some areas, the swamp stores the equivalent of over 95 million tons of carbon dioxide in its peat alone.

**B.    The Twin Pines Mining Proposal**

32. In 2018, Twin Pines announced plans to strip-mine a 12,000-acre tract of land next to the Okefenokee National Wildlife Refuge in 1,000-acre phases over a 30-year period.

33. The proposed mine would be located on an elevated geological terrace called Trail Ridge that forms the eastern boundary of the Okefenokee, acting as a natural dam that keeps the swamp's waters contained.

34. During the mining process, Twin Pines plans to excavate hundreds of acres of currently jurisdictional wetlands that sit atop Trail Ridge, down to approximately 50 feet below the surface.

35. Federal and state agencies and independent experts have communicated to the Corps their concern that Twin Pines' planned excavation process could substantially alter the swamp's hydrology and ecology. For example:

   a. U.S. Department of the Interior: "Based on the best available science, including an updated hydrological review, the Twin Pines project will likely have major negative impacts to the globally significant Okefenokee wetland ecosystem including the Okefenokee National Wildlife Refuge." Letter from Shannon A. Estenoz, Assistant Sec'y for Fish and Wildlife and Parks, U.S. Dep't of Interior, to the Honorable Michael L. Connor, Assistant Sec'y of the Army (Civ. Works) (Mar. 7, 2022).

   b. U.S. Fish and Wildlife Service: "[T]he Service is concerned that the proposed project may pose risks to the Okefenokee National Wildlife Refuge (Okefenokee NWR) due to alterations in soil profiles along Trail Ridge and subsequent changes to the hydrology of the area." Letter from Leopold Miranda, U.S. Fish & Wildlife Serv., to Brigadier Gen. Jason E. Kelly, Commander, S. Atl. Div., U.S. Army Corps of Eng'rs (Dec. 21, 2021).

   c. EPA: "Based on the limited information made available, … the EPA finds that the proposed project will have a substantial and unacceptable impact on aquatic resources

of national importance [the Okefenokee Swamp]." Letter from Mary S. Walker, U.S. Env't. Prot. Agency, to Col. Daniel M. Hibner, U.S. Army Corps of Eng'rs 1 (Oct. 3, 2019).

d. Open letter from more than 85 independent scientists: "[A] majority of the established research supports the claims that mining close to the swamp has a high likelihood of causing permanent damage to the swamp and surrounding areas." Open Letter from Amy Sharma et al. (Sept. 16, 2022).

**C.  The Federal Permitting Process**

36. The Clean Water Act requires landowners to obtain a federal permit before discharging dredged or fill material into "waters of the United States." 33 U.S.C. § 1344. To assist landowners in determining whether they have "waters of the United States" on their property, the Corps offers AJDs as a public service. The purpose of an AJD is to inform a landowner of the Corps' view on whether any streams, wetlands, or other waterbodies on the property are covered by the Clean Water Act (or are "jurisdictional") at the time the approved jurisdictional determination is issued.

37. When Twin Pines first proposed to mine Trail Ridge, the Corps issued two AJDs in December 2018 and January 2020 finding that over 45 percent of the proposed mine site was made up of jurisdictional wetlands, meaning that Twin Pines would need to obtain a Clean Water Act permit before excavating and discharging dredged or fill material into the wetlands.

38. These initial AJDs were issued under the definition of "waters of the United States" implemented by administrations of both major political parties: the 1986 Clean Water Act regulations, as amended in 1993 and interpreted through later guidance documents (typically referred to as the "pre-2015 regulatory regime").

39. In July 2019, Twin Pines submitted its initial Clean Water Act permit application for "Phase One" of the proposed mine, requesting permission to discharge dredged and fill material into at least 587 acres of jurisdictional wetlands and 4,658 linear feet of jurisdictional streams, destroying these aquatic resources.

40. In response, more than 20,000 individuals, along with multiple state and local elected officials, submitted comments opposing the mine and calling for heightened environmental review. State and federal agencies expressed concerns as well, as did the Muscogee (Creek) Nation, which called for the preparation of a full Environmental Impact Statement (EIS), a thorough environmental review required by the National Environmental Policy Act.

41. In December 2019, after reviewing the application and public comments, the Corps agreed that Twin Pines' mine would require the preparation of an EIS. *See* e-mail from Holly Ross, U.S. Army Corps of Eng'rs, to Resource Agencies (Dec. 11, 2019). In response, Twin Pines told the Corps that conducting an EIS would be "unacceptable for [its] business" and withdrew its application. E-mail from Steven Metivier, U.S. Army Corps of Eng'rs, to Col. Daniel Hibner, U.S. Army Corps of Eng'rs (Jan. 16, 2020).

42. In March 2020, Twin Pines submitted a new application, slightly reducing the footprint of the mine in an attempt to avoid preparing an EIS.

43. In response, 44,000 individuals submitted comments to the Corps opposing the mine or calling for the preparation of an EIS.

44. The Muscogee (Creek) Nation submitted a second comment letter as well, expressing concerns about the project's impacts to wetlands, streams, and cultural resources. The letter noted that "[t]his project has been one of the few cases where the Muscogee (Creek) Nation

11

reached out to [the Corps] prior to receiving official correspondence" and requested official consultation regarding the new application. Letter from Turner Hunt, Muscogee (Creek) Nation, to Col. Joseph Geary, U.S. Army Corps of Eng'rs (Apr. 10, 2020).

### D.   The "Navigable Waters Protection Rule" and the NWPR AJDs for Twin Pines

45. During the comment period on Twin Pines' second application, EPA and the Corps promulgated a new federal rule, called the "Navigable Waters Protection Rule," that radically narrowed the definition of "waters of the United States" and, in turn, the scope of waters protected by the Clean Water Act. Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020).

46. Overnight, the NWPR excluded millions of miles of streams and tens of millions of acres of wetlands, including many on the proposed mine site, from federal protection under the Clean Water Act.

47. In June 2020, Twin Pines asked the Corps to replace its December 2018 and January 2020 AJDs, under which the mine site wetlands were determined to be "waters of the United States," with new AJDs issued under the NWPR.

48. In response, the Corps issued new AJDs in October 2020 and March 2021 based on the NWPR.

49. In the new AJDs, the Corps concluded that almost none of the previously protected wetlands on the mine site were jurisdictional under the NWPR, despite having been determined to significantly affect the integrity of traditional navigable waters. In addition, the Twin Pines NWPR AJDs each stated:

> This approved JD will remain valid for a period of 5-years unless new information warrants revision prior to that date …. This communication does not convey any property rights … or any exclusive privileges. It does not authorize … any infringement of federal, state or local laws, or regulations.

12

Letters from William Rutlin, U.S. Army Corps of Eng'rs, to Steven R. Ingle, Twin Pines Minerals (Oct. 15, 2020 and Mar. 24, 2021).

50. The Corps did not consult with the Muscogee (Creek) Nation before issuing either of these new AJDs.

51. The effect of the NWPR AJDs, as recognized by the Corps, was that Twin Pines could "easily redesign the project [layout] to avoid all jurisdictional resources and have 4+ years of mining before getting close to anything jurisdictional [under the NWPR]." Email from Holly Ross, U.S. Army Corps of Eng'rs, to Eric Summerville, U.S. Env't Prot. Agency (Sept. 18, 2020). In other words, Twin Pines could proceed to destroy hundreds of acres of wetlands and construct its proposed mine without any federal oversight under the Clean Water Act.

E.   **Vacatur of the NWPR, Corps' Rulemaking, and January 2022 Corps Guidance**

52. In August and September 2021, two federal courts vacated the NWPR, recognizing the "fundamental, substantive flaws" in the rule. *Pascua Yaqui Tribe v. U.S. Env't Prot. Agency*, 557 F. Supp. 3d 949, 955 (D. Ariz. 2021); *Navajo Nation v. Regan*, 563 F. Supp. 3d 1164 (D.N.M. 2021).

53. The Corps immediately began applying the pre-2015 regulatory regime that had formed the basis for Twin Pines' 2018 and January 2020 AJDs, under which the mine site wetlands were determined to be "waters of the United States."

54. Shortly thereafter, in December 2021, the Corps proposed a new rule "defining the scope of waters protected under the Clean Water Act" and replacing the NWPR. Revised Definition of Waters of the United States, 86 Fed. Reg. 69,372, 69,372, 69,386 (Dec. 7, 2021). In explaining the need for its proposed rule, the Corps determined that the NWPR was "inconsistent

with the objective of the Clean Water Act, the science, and the case law," *id.* at 69,395, laying out in detail the scientific and legal flaws in the NWPR. *See id.* at 69,407–69,416.

55. The following month, in January 2022, Corps headquarters issued an internal guidance document to all 38 Corps districts that instructed district offices how to address specific situations that might arise related to jurisdictional determinations made under the NWPR. U.S. Army Corps of Eng'rs, Implementation of Navigable Waters Protection Rule Vacatur Talking Points, Key Messages, and Questions and Answers (Jan. 4, 2022) (attached as Ex. A).

56. The internal guidance document clarified that "[p]ersons holding NWPR AJDs can no longer rely on those AJDs as accurately depicting jurisdictional waters within the review area of the AJD under now-applicable regulations." *Id*. at 4. It explained that this applied "to all NWPR AJDs, regardless of whether they were affirmative vs. documented a lack of jurisdiction." *Id*. at 5.

57. The internal guidance document further clarified that an NWPR non-jurisdictional determination cannot be used to "support the discharge of dredged or fill material into aquatic resources that are considered to be waters of the U.S. under the pre-2015 regime." *Id*. at 4–5.

**F.     The Corps' Revocation and Reinstatement of the Twin Pines NWPR AJDs**

58. On June 3, 2022, Assistant Secretary Connor issued a memorandum formally rescinding the Twin Pines NWPR AJDs based on the Corps' failure to consult with the Muscogee (Creek) Nation and other Tribal Nations.

59. The memorandum "direct[ed] the Corps to immediately notify the AJD recipients for … the Twin Pines parcels that they cannot rely on those AJDs to accurately delineate jurisdictional waters under the current regulatory regime and that their NWPR AJDs are not valid because the government-to-government consultations for the Federal actions regarding the

determinations of jurisdictional status of waters on the parcels were not conducted as requested by the Tribes." Michael L. Connor, Memorandum re: Approved Jurisdictional Determinations (AJDs) for the Rosemont and Twin Pines Parcels (June 3, 2022).

60. Shortly thereafter, on June 7, 2022, the Environmental Protection Division of the Georgia Department of Natural Resources (Georgia EPD) issued a "Permitting Update" announcing that it would defer action on all pending Twin Pines permit applications until the Corps issued any required federal permit or determined that such a permit was not required.

61. Later that month, Twin Pines challenged the Corps' June 3 memorandum in federal district court. *Twin Pines Minerals, LLC v. U.S. Army Corps of Eng'rs*, 5:2022-cv-00036 (S.D. Ga. June 22, 2022).

62. In August 2022, before filing a responsive pleading, the Corps entered into an out-of-court settlement agreement directing the Corps' Savannah District staff to reinstate the Twin Pines NWPR AJDs. *Twin Pines Minerals, LLC v. U.S. Army Corps of Eng'rs*, 5:2022-cv-00036, Dkt. 28 (Aug. 22, 2022); Twin Pines Minerals, LLC and U.S. Army Corps of Eng'rs, Settlement Agreement (Aug. 22, 2022).

63. At the direction of Corps headquarters, the Savannah District sent a letter to Twin Pines on August 22, 2022—once again, without notice to the Muscogee (Creek) Nation— officially reinstating the Twin Pines NWPR AJDs. Twin Pines Minerals, LLC and U.S. Army Corps of Eng'rs, Settlement Agreement (Aug. 22, 2022) (directing the Savannah District to "provide a letter to Twin Pines reiterating that the Twin Pines AJDs are valid"); Letter from Jason D. O'Kane, U.S. Army Corps of Eng'rs, to Stephen R. Ingle, Twin Pines Minerals (Aug. 22, 2022).

64. The Corps provided no reasoned explanation in either the settlement agreement or the Savannah District's letter to Twin Pines for its decision to reinstate the Twin Pines NWPR AJDs.

65. The reinstatement of the Twin Pines NWPR AJDs marked the consummation of the Corps' decision-making process and triggered legal consequences—namely, a safe harbor from government enforcement through 2025—and therefore constitutes a final agency action.

### G. The Current Landscape

66. After the Corps reinstated the Twin Pines NWPR AJDs, Twin Pines issued a press release indicating its intent to move forward "without further interference from the Corps."

67. Twin Pines currently has earth-moving equipment in place on the mine site near the Okefenokee National Wildlife Refuge.

68. Although Twin Pines must still obtain state surface mining, air quality, groundwater withdrawal, wastewater management, and industrial stormwater permits before mining, those permit requirements do not purport to replace the protections afforded by the Clean Water Act, National Environmental Policy Act, National Historic Preservation Act, Endangered Species Act, or Nation-to-Nation consultation requirements.

69. On August 23, 2022, Georgia EPD issued a "Second Permitting Update" based on the Corps' decision to reinstate the Twin Pines NWPR AJDs. The Second Permitting Update stated that "[b]ecause the 2020 and 2021 AJDs are now in effect, EPD will resume reviewing the state permit applications" for the proposed mine. Ga. Dep't of Nat. Res., *Twin Pines Minerals, LLC: Second Permitting Update* (Aug. 23, 2022).

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Reinstatement of the Twin Pines NWPR AJDs after Determining the NWPR to be Unlawful

70. The Conservation Groups incorporate by reference the allegations contained in the preceding paragraphs.

71. Upon reviewing the NWPR as part of its current rulemaking, the Corps concluded that the NWPR was "inconsistent with the objective of the Clean Water Act, the science, and the case law." Revised Definition of Waters of the United States, 86 Fed. Reg. 69,372, 69,395 (Dec. 7, 2021); *see also id*. at 69,408 ("[B]ased on the text, structure, and history of the statute, the relevant and available science, Supreme Court case law, and the agencies' technical expertise and experience, the agencies have determined that the NWPR . . . fails to achieve the objective of the Act.").

72. Among key concerns, the Corps determined that "[t]he NWPR's exclusion of major categories of waters from the protections of the Act, specifically in the definitions of 'tributary' and 'adjacent wetlands,' runs counter to the scientific record demonstrating how such waters can affect the integrity of downstream waters." *Id.* at 69,408; *see also id.* at 69,394 ("[T]he agencies have concluded that the NWPR was not informed by science, but rather was inconsistent with the best available science in substantially important ways.").

73. The Corps also determined that the NWPR's "limits on the scope of protected wetlands to those that touch or demonstrate evidence of a regular surface water connection to other jurisdictional waters [was] counter to the ample scientific information demonstrating the effects of wetlands on downstream waters when they have other types of connections," *id*. at

69,408, "such as wetlands that overflow and flood jurisdictional waters or wetlands with less frequent surface water connections due to long-term drought; wetlands with shallow subsurface connections to other protected waters; or other wetlands proximate to jurisdictional waters," *id*. at 69,409.

74. Despite determining that the NWPR was unlawful, the Corps decided to formally reinstate the Twin Pines NWPR AJDs based on that rule.

75. The Corps' decision to disregard its own conclusions, without any explanation, does not constitute "reasoned decision-making."

76. The Corps' decision to reinstate the Twin Pines NWPR AJDs, contradicting the agency's own determination that the NWPR was unlawful, is arbitrary, capricious, and not in accordance with law in violation of the Administrative Procedure Act.

**SECOND CLAIM FOR RELIEF**

**Violation of the Administrative Procedure Act**
**Failure to Provide a "Reasoned Explanation" for Reinstating the Twin Pines NWPR AJDs**

77. The Conservation Groups incorporate by reference the allegations contained in the preceding paragraphs.

78. When an action reverses an agency's previous position, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

79. "The reasoned explanation requirement of administrative law… is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019).

80. By reinstating the Twin Pines NWPR AJDs, the Corps reversed at least two decisions it had previously made, and explained, in its June 3 memorandum just two months earlier: (1) that Twin Pines "cannot rely on those AJDs to accurately delineate jurisdictional waters under the current regulatory regime;" and (2) that the Twin Pines "NWPR AJDs are not valid because the government-to-government consultations for the [AJDs] were not conducted as requested by the Tribes." Michael L. Connor, Memorandum re: Approved Jurisdictional Determinations (AJDs) for the Rosemont and Twin Pines Parcels (June 3, 2022).

81. In addition, the Corps' reinstatement of the Twin Pines NWPR AJDs contradicts its internal guidance, which provides that "[p]ersons holding NWPR AJDs can no longer rely on those AJDs as accurately depicting jurisdictional waters within the review area of the AJD under now-applicable regulations." U.S. Army Corps of Eng'rs, Implementation of Navigable Waters Protection Rule Vacatur Talking Points, Key Messages, and Questions and Answers (Jan. 4, 2022).

82. The guidance further clarifies that a non-jurisdictional determination made under the NWPR cannot be used "to support the discharge of dredged or fill material into aquatic resources that are considered to be waters of the U.S. under the pre-2015 regime." *Id.* at 4–5.

83. The Corps' decision to reinstate the Twin Pines NWPR AJDs with no reasoned explanation for reversing its prior decisions or departing from its internal guidance is arbitrary, capricious, and not in accordance with law in violation of the Administrative Procedure Act.

**PRAYER FOR RELIEF**

The Conservation Groups respectfully request that this Court:

A.     Declare that the Corps' reinstatement of the October 2020 and March 2021 Twin Pines NWPR AJDs is arbitrary, capricious, and not in accordance with law in violation of the Administrative Procedure Act;

B.     Vacate and set aside the Corps' reinstatement of the October 2020 and March 2021 Twin Pines NWPR AJDs;

C.     Award the Conservation Groups the costs of this action, including reasonable attorneys' fees, to the extent permitted by law; and

D.     Grant the Conservation Groups such additional relief as the Court deems proper.

Respectfully submitted this 15th day of November, 2022.

/s/ Megan Hinkle Huynh
Megan Hinkle Huynh
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
Telephone: (404) 521-9900
mhuynh@selcga.org

Mark Sabath
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Telephone: (434) 977-4090
msabath@selcva.org

Kelly F. Moser
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
Telephone: (919) 967-1450
kmoser@selcnc.org

*Counsel for the Conservation Groups*